*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-AA-0016

CHILDREN'S NATIONAL MEDICAL CENTER, PETITIONER,

V.

TRAVON T. CELEY, RESPONDENT.

On Petition for Review of an Order of
the District of Columbia Office of Administrative Hearings
(2023-DOES-01346)

(Submitted February 19, 2025          Decided May 1, 2025)

*Christine M. Costantino* was on the brief for petitioner.

Before BECKWITH and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*: Petitioner, Children's Hospital, d/b/a Children's National Medical Center (the Hospital), seeks review of a decision by the Office of Administrative Hearings (OAH) determining that respondent Travon Celey, a former employee of the Hospital, did not willfully violate the Hospital's expectations and therefore was qualified to receive unemployment compensation benefits. For the reasons that follow, we affirm the OAH decision.

## I.    Background

The Hospital terminated Mr. Celey on March 1, 2022, on the ground that he had "incurred six tardiness or lateness occurrences" within a twelve-month period. Thereafter, Mr. Celey applied for unemployment benefits. A District of Columbia Department of Employment Services (DOES) claims examiner determined that Mr. Celey was disqualified from receiving benefits because he had been discharged for gross misconduct. *See* D.C. Code § 51-110(b) (providing that an individual who has been discharged for gross misconduct is temporarily ineligible for benefits); 7 D.C.M.R. § 312.4(k) (providing that gross misconduct may include "[r]epeated absences or tardiness following warning"). Mr. Celey appealed that determination to OAH.[1]

OAH conducted a hearing on November 28, 2023. The Hospital presented two witnesses, Efstratios Gonithellis, the Hospital's director and lead HR business

---

[1] OAH found that the DOES determination was mailed to Mr. Celey at his correct address on March 25, 2022. Mr. Celey did not file his appeal from that determination with OAH until November 9, 2023. That was well beyond the fifteen-day deadline established by D.C. Code § 51-111(b), but OAH determined that the delay arose from good cause (the failure of mail delivery) and then excusable neglect (Mr. Celey's difficulty reading the DOES determination after he obtained a copy and his dealing with a family health emergency) and on those grounds extended the appeal deadline. D.C. Code § 51-111(b). The Hospital asserts in its brief that Mr. Celey's appeal to OAH was "untimely," but does not argue that OAH lacked jurisdiction or should have declined to entertain the appeal.

partner, and Rusty Siedschlag, Mr. Celey's former supervisor. Their testimony and the Hospital's documentary evidence established that the Hospital discharged Mr. Celey, who had worked as an environmental services assistant, following his sixth instance of tardiness within a twelve-month period. The Hospital had previously issued him warnings following his fourth and fifth instances of tardiness. The warning issued after the fourth instance explained that he had violated "Children's National Policy, C-09, Absenteeism and Tardiness [hereinafter, the "independent Attendance Policy"] and Article 3.06, Leave Abuse of the SEIU [Service Employees International Union] contract [hereinafter, the "collective bargaining agreement (CBA) policy"]" and stated that "continued failure to follow this policy and the SEIU contract[] would be cause for additional disciplinary action, up to and including termination." The warning issued after the fifth instance of tardiness contained identical language but also imposed a one-day suspension without pay. The Hospital submitted both warnings, a copy of the independent Attendance Policy, and the relevant excerpt from the CBA as hearing exhibits.

The independent Attendance Policy provides that the Hospital will issue written warnings to employees following their fifth, sixth, and seventh instances of "lateness" and lists termination as an applicable "corrective action" for an eighth occurrence. In contrast, Article 3.06 of the CBA provides for the Hospital to issue

a written warning to an employee following a fourth instance of tardiness, impose a one-day suspension after the fifth instance, and dismiss the employee after the sixth.

Mr. Gonithellis testified that the Hospital provides new employees with various policy documents to review, including the Hospital's employee handbook, during their onboarding. Mr. Siedschlag testified that the Hospital regularly reviewed its independent Attendance Policy with employees. The Hospital submitted into evidence a form signed by Mr. Celey by which he acknowledged that he had reviewed "the Children's National Employee Handbook" and acknowledged his responsibility to be "familiar with" "all Children's National policies."

During his testimony, Mr. Celey acknowledged that he "was late."

The OAH administrative law judge (ALJ) began his analysis by noting that under 7 D.C.M.R. § 312.7, if the basis for disqualification from unemployment benefits is a violation of the employer's rules, it must be established that the employer's rule was known to the employee, that the rule is reasonable, and that the rule is consistently enforced by the employer. *See* 7 D.C.M.R. § 312.7. The ALJ noted that if the Hospital had applied its independent Attendance Policy to Mr. Celey, he would have been subject to only a second written warning upon his

sixth instance of tardiness, rather than being subject to discharge under the more onerous CBA policy that the Hospital applied. The ALJ found that the Hospital "issued inconsistent rules and so gave no notice to [Mr. Celey] of the conduct expected of him, or at least that his conduct could lead to discharge after six occurrences of lateness." Reasoning that Mr. Celey's conduct "subjected him to inconsistent disciplinary outcomes depending on which rule [the Hospital] applied," the ALJ concluded that Mr. Celey "did not willfully violate the Employer's expectations" and thus was qualified to receive unemployment benefits.

The Hospital's petition for review followed. The Hospital argues that the ALJ's suggestion that the Hospital had the option of applying its independent Attendance Policy instead of the CBA, and the ALJ's "premise of an 'inconsistency' between the CBA and the [Hospital's] general policy guidelines for attendance and tardiness," are "contrary to the basic tenets" of and reflect a "misapprehension [or] misapplication" of "federal labor law." The Hospital further argues that the ALJ's conclusion that there was inconsistency in the Hospital's application of its rules was not supported by substantial evidence.

Mr. Celey has not filed a brief.

## II.    Standard of Review

Our review of OAH decisions is limited.  We will affirm if (1) OAH "made findings of fact on each materially contested issue," (2) each finding is supported by substantial evidence, and (3) OAH's conclusions "flow rationally from its findings of fact."  *Luo v. D.C. Dep't of Emp. Servs.*, 331 A.3d 840, 846 (D.C. 2025) (*Young v. D.C. Dep't of Emp. Servs.*, 268 A.3d 827, 830 (D.C. 2022)).

## III.    Analysis

The Hospital quite understandably takes issue with the ALJ's remark that the Hospital's "inconsistent attendance rules are not reasonable and . . . are not consistently enforced."  We acknowledge the testimony by the Hospital's witnesses (which the ALJ did not discredit) that the Hospital had consistently enforced its CBA discharge-after-six-incidents-of-tardiness policy against other covered employees.  We also accept the Hospital's assertion that it is obliged to follow the provisions of the CBA in disciplining employees who are subject to the CBA as union members, including Mr. Celey, and we discern nothing "unreasonable" about the tardiness policy set out in the CBA.

We are not persuaded, however, that reversal of the OAH decision is warranted.[2] The issue before OAH was the narrower question of whether Mr. Celey was disqualified from receiving unemployment benefits based on a violation of the employer's rules. Under the District's unemployment compensation regulations and our case law, the answer to that question depends on whether the Hospital as his employer established that he was on notice that a sixth instance of lateness could subject him to termination. *See Colton v. D.C. Dep't of Emp. Servs.*, 484 A.2d 550, 553 (D.C. 1984) ("The 'critical inquiry' . . . in any misconduct case, is whether petitioner was on notice that she could be discharged for her actions." (quoting *Jones v. D.C. Unemployment. Comp. Bd.*, 395 A.2d 392, 395 (D.C. 1978))). The ALJ found that Mr. Celey was *not* on notice, and we are satisfied that that finding, which is the linchpin of the OAH ruling, was based on substantial evidence.

---

[2] Further, notwithstanding the ALJ's remark about the "not reasonable" inconsistency in the Hospital's attendance rules, we do not read the OAH decision as suggesting that the Hospital acted wrongfully or contrary to law in terminating Mr. Celey after his sixth incident of tardiness. As we have repeatedly observed, the issue of whether an employee has engaged in disqualifying misconduct for purposes of unemployment compensation is distinct from the issue of whether the employer was justified in its decision to discharge the employee. *See Bowman-Cook v. Wash. Metro. Area Transit Auth.*, 16 A.3d 130, 134 n.5 (D.C. 2011); *Capitol Entm't Servs. v. McCormick*, 25 A.3d 19, 27 (D.C. 2011) ("[N]ot every act for which an employer justifiably may dismiss an employee will support the employee's disqualification from receipt of unemployment benefits because of misconduct.").

Most notably, the ALJ found as follows:

> Claimant signed an acknowledgement that he received a copy of the Attendance Policy on March 9, 2021, although *it is unclear if Claimant received one or both of the policies*. There is a question as to whether Claimant could read or understand the written policy, but his manager, Mr. Siebschlag, frequently reviewed the attendance requirements with Claimant and his co-workers over the course of the next two years, although *it is unclear which version of the Attendance Policy Mr. Siebschlag disclosed to the employees*.

OAH Order at 3 (italics added, citations omitted). A review of the hearing transcript and exhibits discloses that while the Hospital's witnesses specifically testified that Hospital employees are advised about the Hospital's policies and provided with an employee handbook and other policy documents during onboarding, neither witness stated that employees who are union members, or Mr. Celey in particular, was shown, advised about, or reminded of the discipline-for-tardiness policy set out in the CBA. And while Mr. Gonithellis and Mr. Siebschlag testified that the Hospital regularly reviewed the independent Attendance Policy and its tardiness disciplinary process with Mr. Celey, at no point did they state that the Hospital clarified to Mr. Celey that he was subject to the CBA's more onerous provisions. Thus, substantial evidence supports the ALJ's finding that it is "unclear" whether Mr. Celey was educated about the details of the policy that applied to him as a SEIU member.

Further, the warning notices Mr. Celey received cited *both* the independent Attendance Policy and the CBA policy notwithstanding their inconsistent corrective-action provisions. Moreover, the warning notices did not quote or summarize the CBA language, and nothing in the record suggests that the relevant article (3.06) of the CBA was attached to the warning letters. And, although the two warning letters referred to "additional disciplinary action, up to and including termination" as possible discipline for "continued failure" to follow the policy on tardiness, neither letter stated how many more instances of tardiness would subject Mr. Celey to termination. Given the evidence that all Hospital employees received a copy of the independent Attendance Policy (which provides for termination as a possible disciplinary action only after an eighth incident of tardiness) and the lack of clear evidence that Mr. Celey received a copy of or was advised about the particulars of the CBA tardiness policy, the ALJ could reasonably have declined to infer that Mr. Celey knew of the CBA policy prescribing termination after a sixth incident of tardiness. Similarly, the ALJ was not compelled to find that Mr. Celey was sufficiently put on notice that the CBA policy rather than the independent Attendance Policy applied when he received a written warning after his fourth instance of tardiness and was suspended after his fifth (corrective actions called for by the CBA but not by the independent Attendance Policy). As to the suspension,

Mr. Celey seemed not to recall that he had been suspended and thus seems not to have attached any interpretive significance to the suspension.

On this record, the ALJ reasonably could find that Mr. Celey was not on notice that he could be discharged upon his sixth incident of tardiness. Accordingly, we will not disturb OAH's determination that the CBA policy could not be invoked to disqualify Mr. Celey from receiving unemployment benefits.[3]

## IV.  Conclusion

For the foregoing reasons, the OAH decision is affirmed.

*So ordered.*

---

[3] The Hospital, positing that "a single employer may work with different unions who bargain for different progressive discipline policies," reasons that "implementing the proper, applicable progressive discipline based on the relevant CBA for [a particular] employee's union" should not be thought to "somehow create an 'inconsistency' in the employer's rule enforcement." We agree, but the lesson of this case is that the employer must be able to prove that employees subject to different progressive disciplinary policies are made aware of the progressive discipline that applies to members of their bargaining unit if the rules are to be invoked to deny them unemployment benefits.